# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SANTANDER HOLDINGS USA, INC. & SUBSIDIARIES, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| UNITED STATES OF AMERICA, | ) ) ) |
| Defendant. | ) ) ) |

Case No. 09-cv-11043

Hon. George A. O'Toole, Jr.

April 27, 2012

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S FED. R. CIV. P. 30(a)(2)(B) MOTION FOR LEAVE TO DEPOSE AN INMATE

Plaintiff Santander Holdings USA, Inc. (formerly Sovereign Bancorp, Inc. and hereinafter "Plaintiff"), respectfully opposes Defendant United States of America's motion under Rule 30(a)(2)(B) of the Federal Rules of Civil Procedure for leave to depose Mr. Raymond J. Ruble (inmate number 58202-054), an incarcerated individual ("Def. Motion").

## I.       INTRODUCTION

Mr. Ruble participated in the preparation of the tax opinion issued by Sidley, Austin, Brown & Wood ("Sidley Austin") to Plaintiff regarding the tax consequences of the STARS transaction at issue in this litigation.  Mr. Ruble, however, departed Sidley Austin before the opinion was finalized and issued, and recently began serving a sentence in federal prison for conduct totally unrelated to any of the facts or circumstances underlying this litigation.  Mr. Ruble has indicated in this case that he intends to assert his Fifth Amendment right not to testify in response to any question other than his name.  Defendant nonetheless moves to depose Mr. Ruble, over whom Plaintiff has no control, to elicit his silence so that Defendant can seek to ask the jury to draw an adverse inference against Plaintiff.  Defendant should not be permitted to

burden the parties with Mr. Ruble's deposition given the lack of any legitimate evidentiary benefit that will result in this case from Mr. Ruble's invocation of his constitutional right to remain silent.  Defendant's ultimate objective can only be to prejudice the Plaintiff at trial.

Mr. Ruble's silence in these circumstances bears no relevance to his role in Plaintiff's STARS transaction.  To the contrary, it is clear that Mr. Ruble's Fifth Amendment assertion is based on independent and personal reasons relating to his role with respect to wholly unrelated and outdated tax shelters known as BLIPS.  Mr. Ruble's work on STARS occurred almost a decade ago.  Since then, he has been convicted, disbarred and will be in prison for several more years, until he is over 70 years old.  He will never represent Sovereign again.  In light of all this, what possible incentive would Mr. Ruble have to defend the work he performed in connection with STARS or to otherwise try to salvage his reputation?  His silence is meaningless to the matters presently at issue in this case and its admission would be highly prejudicial to Plaintiff.

Indeed, Defendant has not identified any nexus between Mr. Ruble's assertion of his Fifth Amendment rights and any issue in this case, and it should not be permitted to imply a relevance bridge where none exists.  STARS involved nothing nefarious, let alone criminally unlawful.  It was a commercial financing transaction in which the participating U.S. banks paid the same amount of worldwide tax (or more) after entering into STARS as they had before.  Under the STARS structure, Sovereign paid U.K. tax at a rate of 22 percent on the income from certain assets placed in a U.K. resident trust and claimed U.S. foreign tax credits for those amounts.  Because the tax treatment of STARS complied with the technical requirements of the Internal Revenue Code, the IRS had to resort to the amorphous common law doctrine of economic substance to justify challenging Sovereign's tax credits.  As a result of the IRS's disallowance of foreign tax credits, Sovereign was subject to an effective tax rate of 57 percent

(rather than the typical corporate rate of 35 percent).  In this case, Sovereign seeks a refund in order to recover this 22 percent differential (in addition to challenging the IRS's other adjustments).  Sovereign is not alone.  Three other major U.S. banks (Wells Fargo, BB&T and Bank of New York Mellon Corp.) are also contesting the IRS's determination and are seeking refunds of the disallowed amounts in their respective STARS Litigations.[1]

The tax opinion issued by Sidley Austin to Plaintiff was in no way an outlier and Mr. Ruble's unrelated conduct should not cast a pall over it.  Indeed, Sovereign also received a "should" level[2] tax opinion from KPMG and the reasonableness of Sovereign's proposed tax treatment of STARS was independently reviewed and approved by Sovereign's independent auditor, Ernst & Young.  In addition, the limited number of U.S. banks that participated in STARS also received "should" level tax opinions from a number of reputable third-party advisors, including Mayer Brown, Ernst & Young, and KPMG.  Neither the Department of Justice nor the IRS has ever asserted that Mr. Ruble's involvement in the STARS transaction remotely approached criminal tax evasion.  Nor is Plaintiff aware of any "promoter" claims that Defendant has pursued against Mr. Ruble, Sidley Austin, or any third party related to this case. While monetary tax penalties (referred to as accuracy-related penalties) are at issue in this matter, the IRS has not sought such monetary penalties in the BONY STARS Litigation even

---

[1] The "STARS Litigations" are comprised of the following four cases: *Santander Holdings USA, Inc. & Subs. v. United States*, No. 1:09-cv-11043-GAO (D. Mass. filed June 17, 2009); *Salem Fin., Inc. v. United States*, No. 1:10-cv-00192-TCW (Fed. Cl. filed March 30, 2010); *Wells Fargo & Co. v. United States*, No. 0:09-cv-02764-PJS-AJB (D. Minn. filed Oct. 5, 2009); and *Bank of New York Mellon Corp., as successor in interest to The Bank of New York Co. v. Comm'r*, No. 26683-09 (T.C. filed Nov. 10, 2009) (hereinafter, the "BONY STARS Litigation").

[2] "Should"-level opinions generally reflect a confidence level of at least 70 percent that the tax treatment of a transaction will be upheld by a court if challenged by the IRS.

though Mr. Ruble was involved with the Sidley Austin tax opinion issued in connection with that transaction.

What is going on here is clear—Defendant wants to reveal Mr. Ruble's personally-motivated and unrelated constitutional silence to the jury for its inflammatory effect in the hopes that Plaintiff will be found "guilty by association" rather than judged based on the merits of its legal position.  If the United States truly desired to obtain Mr. Ruble's substantive testimony, it could grant him immunity from prosecution related to his role in STARS, which ended in 2003, well beyond the applicable statute of limitations under 26 U.S.C. § 6531.  It cannot choose to forgo that option (which Plaintiff does not have) but then seek to draw an adverse inference against Plaintiff based on Mr. Ruble's silence in response to provocative questions about STARS.  The burden and cost associated with taking Mr. Ruble's deposition simply to obtain a record of his meaningless Fifth Amendment assertion are not warranted.

## II.  BACKGROUND

The primary issue in this case is whether Plaintiff properly reported its federal income tax liabilities in connection with the STARS financing.  Sovereign entered into the STARS transaction in 2003 and 2004 for the purpose of obtaining a total of $1.15 billion in financing from Barclays at an interest rate over 330 basis points below its ordinary cost of funds.  Barclays was able to offer this low-cost financing due to U.K. tax benefits it received as a result of the STARS structure.  Pursuant to the terms of the transaction, Sovereign transferred approximately $7 billion in assets to a wholly-owned limited liability company that distributed the income on those assets to a U.K. trust.  Plaintiff, through the U.K. trust, paid U.K. tax on the income generated by these assets.  Plaintiff properly claimed foreign tax credits on its federal income tax returns equal to the amount of U.K. taxes paid.  Before deciding to proceed with the STARS

transaction, Sovereign thoroughly vetted and analyzed the proposed financing arrangement internally and with a number of external advisors—Sidley Austin, KPMG, and Ernst & Young. Among other things, Plaintiff sought the advice of Sidley Austin to examine the tax consequences and proper federal tax treatment of STARS, and Sidley Austin issued a "should" level tax opinion to Sovereign.

Nonetheless, the United States disallowed the foreign tax credits, resulting in Sovereign being taxed twice on the same income, and assessed interest and 20 percent accuracy-related penalties on the unpaid amounts.  In turn, Plaintiff paid these amounts and filed this suit to obtain a refund of the 22 percent differential between the typical corporate rate of 35 percent and the effective tax rate of 57 percent resulting from the double tax imposed under the IRS's determination.  In connection with the monetary penalties, Plaintiff has asserted a reasonable cause and good faith defense under 26 U.S.C. § 6664 based on, among other things, its reasonable reliance on legal advice, including the "should" level tax opinion received from Sidley Austin.

Mr. Ruble was a partner at Sidley Austin and was involved in the drafting and analysis associated with the Plaintiff's STARS tax opinion.  But the co-head of Sidley Austin's tax practice, Thomas Humphreys, actually finalized and executed the tax opinion on November 6, 2003, in connection with the STARS closing, which was after Mr. Ruble left the firm.  In addition to Mr. Humphreys, several other tax partners and associates were involved in reviewing and finalizing the Plaintiff's tax opinion.  As part of that process, Sidley Austin provided separate, written assurances to Plaintiff that the opinion was valid and that the reasons for Mr. Ruble's departure were unrelated to his work on STARS.  Declaration of James C. McGrath, Esq. ("McGrath Dec."), Ex. <u>A</u>.

Mr. Ruble was later convicted of tax evasion in connection with his role in issuing tax opinions in individual tax shelter transactions known as bond linked issue premium structures (or BLIPS).  As reflected in *United States v. Ruble*, No. S1 05 Crim. 0888 (LAR), 2009 U.S. Dist. LEXIS 34908 (S.D.N.Y. Apr. 2, 2009), cited by the United States, Mr. Ruble's conviction was unrelated to STARS.  BLIPS involved individual investors taking bank loans and shifting them to partnerships for the purpose of claiming a loss on their tax returns.  They bear no resemblance to STARS structurally, conceptually, or in terms of tax consequences, and Mr. Ruble's involvement in BLIPS occurred years earlier than his work for Plaintiff, while he was practicing at Brown & Wood prior to its merger with Sidley Austin.  *See generally id.*  Indeed, the IRS has not attempted to, nor is there a basis for, drawing any connection between BLIPS and STARS. Mr. Ruble was disbarred from the practice of law in July 2009.  *In re Raymond J. Ruble*, 883 N.Y.S.2d 36, 37-38 (N.Y. App. Div. 2009) (per curiam).  He recently began serving a multi-year year prison sentence in Pennsylvania in connection with his conviction and he will be over 70 years old when he is released.

Not surprisingly given his situation, in a letter dated April 22, 2012, Mr. Ruble confirmed that he "will exercise [his] Constitutional rights to remain silent if [he is] deposed" in this case.[3] McGrath Dec., Ex. <u>D</u>.  Despite the lack of any connection between Mr. Ruble's improper conduct and the validity of the Plaintiff's STARS tax opinion, the United States "will seek that an adverse inference be drawn from his refusal to testify."  Def. Motion ¶ 4.

---

[3] As Defendant acknowledges, on February 1, 2012, Mr. Ruble advised counsel for the IRS in the BONY STARS Litigation that "I will exercise my 5th amendment right to remain silent with respect to all questions other than my identity."  Def. Motion ¶ 4; McGrath Dec., Ex. <u>B</u>.  Counsel for Plaintiff has since written to Mr. Ruble to confirm his intention that he will exercise his Fifth Amendment rights in this case and in the Salem Financial STARS Litigation as well.  McGrath Dec., Ex. <u>C</u>.

### III.    <u>ARGUMENT</u>

Under Rule 30(a)(2) of the Federal Rules of Civil Procedure, "[a] party must obtain leave of court, and the court must grant leave to the extent consistent with Rule 26(b)(2): . . . (B) if the deponent is confined in prison." FED. R. CIV. P. 30(a)(2)(B).  Under Rule 26(b)(2)(C), "the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that: (i) *the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive*; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) *the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case*, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." FED. R. CIV. P. 26(b)(2)(C) (emphasis added).

In this context, the relevant inquiry under Rule 26(b)(2)(C) "mainly involve[s] balancing the benefit of the proposed discovery with its likely burdens." *Krupp v. City of St. Louis Justice Ctr., et al*., No. 4:07-CV-883 (JCH), 2007 WL 4233558, *1 (E.D.Mo. Nov. 28, 2007) (citing FED. R. CIV. P. 26(b)(2)(C)) ("[A]llowing depositions without knowing whether they will have any probative value places an undue burden on the inmates, the jail, and [the other party]."); *see also Braham v. Lantz*, No. 3:08-CV-1564 DFM, 2011 WL 4809032, *1 (D. Conn. Oct. 11, 2011) (denying motion for leave to depose, in part, because "plaintiff has not indicated what discoverable information the proposed deponents might have" and because "the court does not have any information from the Department of Correction regarding possible security and logistical concerns").  Finally, "Rule 26. . .'vests the trial judge with broad discretion to tailor

discovery *narrowly* and to dictate the sequence of discovery.'" *Id*. (emphasis added) (citing *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998)).

> **A.     The Burden and Expense of Deposing Mr. Ruble Simply To Memorialize His Fifth Amendment Assertion Far Outweighs Its Likely Benefit Given That His Silence Is Inadmissible Against Plaintiff.**

As Defendant anticipates, Mr. Ruble has advised that he intends to exercise his Fifth Amendment right to remain silent with respect to all questions asked of him other than his identity.  Def. Motion ¶ 4; *see also* McGrath Dec., Exs. B; D.  Mr. Ruble's anticipated silence therefore assures that Defendant will not obtain any substantive testimony regarding the STARS transaction or other circumstances surrounding this case.  The burden and expense associated with his deposition is not justified because Mr. Ruble's silence is not admissible to create an adverse interest against Plaintiff (for the reasons discussed below).  *See* FED. R. CIV. P. 26(b)(2)(C)(iii).  The burdens of preparing for Mr. Ruble's deposition in Pennsylvania include travel to and from Pennsylvania, attorney time, court reporter and videographer resources, and securing accommodations and ensuring security at the prison.  Defendant's position that an adverse inference is appropriate must also be analyzed in light of Defendant's ability to secure Mr. Ruble's substantive testimony simply by granting him immunity from prosecution for STARS-related conduct that is, in all events, beyond the applicable statute of limitations.  *See* 18 U.S.C. § 6003.[4]

---

[4] Section 6003 provides that: "(a) In the case of any individual who has been or may be called to testify or provide other information at any proceeding before or ancillary to a court of the United States . . . the United States district court for the judicial district in which the proceeding is or may be held ***shall issue***, in accordance with subsection (b) of this section, ***upon the request of the United States attorney*** for such district, ***an order requiring such individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination***, such order to become effective as provided in section 6002 of this title.  (b) A ***United States attorney may***, with the approval of the Attorney General, the Deputy Attorney General, the Associate Attorney General, or any designated Assistant Attorney General or Deputy Assistant Attorney General, ***request an order [granting immunity]***

Further, "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." FED. R. CIV. P. 26(b)(2)(C)(i).  The Defendant intends to depose Mr. Humphreys, who actually finalized and executed the tax opinion; Craig Chapman, another Sidley Austin partner who provided the written assurances to Plaintiff regarding the opinion; Mr. Tuths, the associate who worked extensively on the Plaintiff's tax opinion; and Graeme Harrower, who rendered U.K. tax advice to the Plaintiff regarding the STARS transaction.  Given the availability of other witnesses with the same knowledge of Sidley Austin's tax advice and the irrelevance of the circumstances causing Mr. Ruble to assert his Fifth Amendment right, the burdens of preparing for Mr. Ruble's deposition in Pennsylvania outweigh any conceivable benefit to Defendant— particularly considering that Mr. Ruble's invocation of the privilege, and any inferences drawn therefrom, are not admissible in this case.

B.   **No Basis Exists To Draw An Adverse Inference Against Plaintiff From Mr. Ruble's Silence, Which Is Irrelevant and Prejudicial.**

Defendant acknowledges that, while they realize that Mr. Ruble may assert his Fifth Amendment privilege in response to questions regarding his role in the STARS transaction, they intend to "seek that an adverse inference be drawn [against Plaintiff] from his refusal to testify." Def. Motion ¶ 4.  Defendant provides absolutely no basis for why such an inference would be appropriate or is relevant to any factual issue in this case.

While some courts have allowed the drawing of inferences from claims of privilege by non-party witnesses, *see e.g.*, *RAD Servs, Inc. v. Aetna Cas. and Sur. Co.*, 808 F.2d 271 (3d Cir.

---

under subsection (a) of this section ***when in his judgment***--(1) the testimony or other information from such individual may be necessary to the public interest; and (2) ***such individual has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self-incrimination***." 18 U.S.C. § 6003 (emphasis added).

1986), drawing an adverse inference from Mr. Ruble's exercise of the privilege is impermissible under the circumstances of this case.  The Fifth Amendment is a *personal* privilege, which should not be imputed, particularly in circumstances, like here, where the party and non-party do not share an employment relationship, a relationship of loyalty, or a common interest in the litigation.  *See*, *e.g*., *Veranda Beach Club Ltd. v. Western Sur. Co*., 936 F.2d 1364, 1374 (1st Cir. 1991) (declining to draw an adverse inference against an employer based on its employee's assertion of the "personal" Fifth Amendment privilege); *Brookridge Funding Corp. v. Aquamarine, Inc*., 675 F. Supp. 2d 227, 234 (D.Mass. 2009) (declining to draw an adverse inference from exercise of the privilege by the principal of a related party); *In re WorldCom, Inc*., 377 B.R. 77, 110 (Bankr. S.D.N.Y. 2007) (declining to draw an adverse inference from exercise of the privilege by non-party employees/principals of the debtor), *rev'd on other grounds*, *Liberty Media Corp. v. Vivendi Universal, S.A*., 2012 WL 1097351 (S.D.N.Y. Apr. 2, 2012); *Willingham v. County of Albany*, 593 F.Supp.2d 446, 453 (N.D.N.Y. 2006) (declining to draw an adverse inference against a party (the county) from its co-defendant's invocation of the privilege)*; Banks v. Yokemick,* 144 F.Supp.2d 272, 290 (S.D.N.Y. 2001) (declining to draw an adverse inference from the exercise of the privilege because drawing a negative inference would not advance the search for truth).

In order to evaluate the admissibility of an adverse inference drawn from the assertion of the personal Fifth Amendment privilege by a non-party witness in a civil case, courts make a case-by-case determination, focusing on "whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth," and whether drawing an adverse inference would be unduly prejudicial in light of its probative value.  *LiButti v. United States*, 107 F.3d 110, 124 (2d Cir. 1997); FED. R. EVID. 403.  The adverse inference is potentially

relevant, appropriate and admissible only if the non-party's assertion of the privilege is motivated by a desire to protect a party, rather than by purely personal reasons.  On the other hand, if the witness has no such interest in protecting a party, and has no current ties with the party, or interest in the litigation, a court is more likely to conclude that the witness is simply asserting the privilege for his own personal reasons, and the adverse inference sought by the opposing party is, therefore, less likely to be trustworthy evidence, less relevant to the case, and inadmissible.

In order to evaluate whether the witness's invocation of the privilege is motivated by a desire to protect the party, or by personal reasons, courts generally consider the following factors, drawn from the Second Circuit's decision in *LiButti v. United States*, which provide some objective criteria on which to assess the non-party witness's motivations: (i) the nature of the relevant relationships; (ii) the degree of control of the party over the non-party witness; (iii) the compatibility of the interests of the party and the non-party witness in the outcome of the litigation; and (iv) the role of the non-party witness in the litigation.  *LiButti*, 107 F.3d at 123-24. *See Cowans v. City of Boston*, Civ. A. No. 05-CV-11574-RGS, 2007 WL 28419, *3 n.6 (D.Mass. Jan. 4, 2007).  If the *LiButti* factors show that the motivation is protective, a court is more likely to accept the adverse inference as relevant and appropriate.  If the factors show a more personal motivation, like here, a court is less likely to accept the adverse inference as relevant or appropriate.

An analysis of these factors compels a finding that Mr. Ruble's invocation of the privilege is not trustworthy to create any reasonable basis to draw an adverse interest against Plaintiff.  Permitting Defendant to argue such an inference to the jury would be unnecessarily

prejudicial, particularly when Defendant could secure Mr. Ruble's substantive testimony simply by granting him immunity.

> ## 1. Mr. Ruble Does Not Have Any Continuing Relationship of Loyalty or Allegiance to Plaintiff.

With respect to the first factor, *LiButti* instructs that the nature of the relationship between the party and non-party—"invariably . . . the most significant circumstance. . .should be examined . . . from the perspective of a non-party witness' loyalty to the plaintiff or defendant," reasoning that, "[t]he closer the bond, whether by reason of blood, friendship or business, the less likely the non-party witness would be to render testimony in order to damage the relationship." 107 F.3d at 123. Typically, the deeper the loyalty, the less likely it is that the non-party witness would render testimony adverse to the party and, therefore, the non-party's silence may be trustworthy to create an adverse inference. *See LiButti*, 107 F.3d at 123. Whether the witness presently has a relationship with the party is the relevant inquiry. *See In re Handy & Harman Ref. Group, Inc.*, 266 B.R. 32, 35 (Bankr. D. Conn. 2001) (declining to draw an adverse inference against debtor's former controller, in part because creditor "has provided no basis for a finding that there is presently any relationship between the witness and the debtor"); *In re WorldCom, Inc.*, 377 B.R. at 110 ("Claimants have not sufficiently demonstrated the compatibility of WorldCom's interests to the interests of [the non-party witnesses] at the time of their invocation of the Fifth Amendment.").

Here, Plaintiff's only relationship with Mr. Ruble, through his law firm, occurred almost ten years ago. It was limited to obtaining Mr. Ruble's professional services in connection with the STARS transaction, and nothing about it suggests that, even then, Mr. Ruble was in any way beholden to Plaintiff. That relationship ceased in 2003 and has no potential to resume. Since 2003, Mr. Ruble has been convicted, disbarred, and is highly unlikely to practice law again when

he is released from prison over the age of 70. There is no reason to believe Mr. Ruble holds out any hope of resuming an attorney-client relationship with Plaintiff.

In contrast to cases where adverse inferences have been admissible, Mr. Ruble and Plaintiff do not now—and did not ever—have the requisite allegiance or loyalty to render Mr. Ruble's exercise of the privilege trustworthy if imputed to Plaintiff. For example, adverse inferences are drawn most frequently in circumstances where the party and witness are bound by a current or former employment relationship[5], or where there exists evidence of collusion, joint action or conspiracy between the witness and the party.[6] The existence of a relationship alone, either employer/employee or otherwise, without additional evidence linking the witness's invocation of the Fifth Amendment to the circumstances at issue in the present litigation is insufficient to justify the drawing of an adverse inference against a party. *See, e.g.*, *Veranda Beach*, 936 F.2d at 1374 (emphasis added) ("In a civil case . . . an individual's invocation of a *personal* privilege against self-incrimination cannot, *without more*, be held against his corporate employer. . ."). Accordingly, in the absence of continued loyalty, allegiance—or evidence supporting a more significant relationship— between Plaintiff and Mr. Ruble, the drawing of an adverse inference is not warranted.

### 2.      Plaintiff Does Not Now Control, and Has Not Ever Controlled, Mr. Ruble or His Testimony.

*LiButti* instructs that "[t]he degree of control which the party has vested in the non-party witness in regard to the key facts and general subject matter of the litigation will likely inform the trial court whether the assertion of the privilege should be viewed as akin to testimony approaching admissibility under Fed. R. Evid. 801(d)(2), and may accordingly be viewed . . . as

---

[5] *See*, *e.g.*, *RAD Servs,* 808 F.2d at 277-78.

[6] *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Abrams*, No. 96 C 6365, 2000 WL 574466, *7 (N.D. Ill. May 11, 2000).

a vicarious admission."   107 F.3d at 123.   Even a hierarchical employment relationship, for example, may not be sufficient evidence of control.   *Banks,* 144 F.Supp.2d at 290 (stating that the rank and partnership among the party-police officer and his colleagues, witnesses, was insufficient evidence of "the necessary degree of control").

Plaintiff never had—and certainly does not now have—control over Mr. Ruble.   The limited business relationship between Plaintiff and Mr. Ruble was not based on control or subordination.   Rather, Plaintiff engaged Sidley Austin to advise and opine on a proposed financing transaction.   As such, Plaintiff has no ability to control or guide Mr. Ruble's testimony in response to questions asked in this present litigation.   Indeed, the United States is the only party with any control over Mr. Ruble in this situation and could compel Mr. Ruble's testimony by offering immunity.   In the absence of a relationship based on such influences, the drawing of an adverse inference is not warranted here.

### 3.   Mr. Ruble's Exercise of His Fifth Amendment Privilege Advances His Own Interests and Does Not Advance Plaintiff's Interests in This Case.

With respect to the third factor, *LiButti* instructs that "[t]he trial court should evaluate whether the non-party witness is pragmatically a noncaptioned party in interest and whether the assertion of the privilege advances the interests of both the non-party witness and the affected party in the outcome of the litigation." 107 F.3d at 123.   This factor weighs against the admissibility of an adverse inference for several reasons.

First, Mr. Ruble has no interest in or incentive to affect the outcome of this action.   Mr. Ruble's unrelated criminal actions have no bearing on this case and Plaintiff's reliance on Sidley Austin's opinion has no bearing on Mr. Ruble's unrelated criminal actions.   Defendant seeks to imbue the case with unsavory atmospherics based on irrelevant evidence of Mr. Ruble's unrelated conduct.   But there is no suggestion that Defendant is pursuing promoter claims against

14

any third party.  STARS is not a criminal case, and to Plaintiff's knowledge, no one has ever

asserted that Mr. Ruble's involvement, or anyone else's involvement, in the STARS transaction

remotely approached criminal tax evasion.  In any event, the six year statute of limitations for

any criminal prosecution based on Mr. Ruble's conduct has long since passed.  *See* 26 U.S.C.

§ 6531.  Thus, whatever is motivating Mr. Ruble to invoke his Fifth Amendment right cannot be

related to STARS.[7]

Second, given that Mr. Ruble cannot be remaining silent out of fear that he will be

prosecuted for his dated involvement in STARS, it is clear that Mr. Ruble's assertion of the Fifth

Amendment is personally motivated.  *See, e.g.*, *In re WorldCom, Inc.*, 377 B.R. at 110 (finding

no compatibility of interests between the witnesses and WorldCom, the court stated that it could

just as easily find that the non-parties invoked the privilege to protect their own interests).  Mr.

Ruble has nothing to gain or lose from testifying in this case—he will not be released from

prison until he is over 70 years old and he has been suspended from the practice of law.  *In re*

*Raymond J. Ruble*, 883 N.Y.S.2d 36, 37-38 (N.Y. App. Div. 2009) (per curiam).  Whether he

testifies or not will have little affect on his irreparably damaged reputation or any hope that he

will practice law again; all of which leaves him little incentive to speak.

Finally, regardless of Mr. Ruble's present motivation for exercising the privilege, the

Fifth Amendment has been construed as a "*personal decision*[, which] cannot be imputed to a

---

[7]  The circumstances here are factually distinct from those in *State Farm Mutual Automobile Insurance Co.* or in *F.D.I.C. v. Fidelity & Deposit Co. of Maryland*, where the non-party witnesses were engaged in co-conspiracy or collusion with the party such that their silence could reasonably be imputed to the party to infer guilt.  *See State Farm Mut. Auto. Ins. Co.*, 2000 WL 574466 at *7 ("As alleged co-conspirators . . . the interests in the outcome of the litigation of the invoking []and non-moving [parties] align directly with the interests of the [moving parties]: all have been accused of fraudulent conduct."); *F.D.I.C. v. Fidelity & Deposit Co. of Maryland*, 45 F.3d 969, 977 (5th Cir. 1995) (stating that "a jury could determine that a witness who colluded with [an accused] took the Fifth Amendment to avoid disclosing that collusion.").

corporation," such as Plaintiff here. *Veranda Beach*, 936 F.2d at 1374 (emphasis added) (citing *United States v. White*, 322 U.S. 694, 699 (1944) ("Since the privilege against self-incrimination is a purely personal one, it cannot be utilized by or on behalf of any organization, such as a corporation.")). Thus, the absence of aligned interests, coupled with Mr. Ruble's personal reasons for exercising the privilege, prohibits the drawing of an adverse inference against Plaintiff here.

> **4.      Mr. Ruble's Relation to this Case Does Not Warrant Drawing an Adverse Inference.**

In analyzing the fourth and final factor, *LiButti* instructs that "[w]hether the non-party witness was a key figure in the litigation and played a controlling role in respect to any of its underlying aspects also logically merits consideration by the trial court." 107 F.3d at 123-24. Here, Mr. Ruble is neither a key figure in this litigation nor did he play a controlling role in the underlying merits. He had departed Sidley Austin before the tax opinion was finalized and issued. Even if he were, however, courts may decline to draw the adverse inference against a party where the circumstances of the case do not otherwise warrant its imputation. *See Willingham*, 593 F.Supp.2d at 453 ("[W]hile, as noted, [the party-invoker] played a central role in the events of this case, any adverse inferences from his invocation of the privilege are insufficiently reliable when considered against the County and any such inferences will not be applied against the County.") Therefore, where the balance of the *LiButti* factors favor a party, such as Plaintiff here, imputation of an adverse inference is unwarranted.

In sum, without evidence of allied interests, control, loyalty, or joint action between Mr. Ruble and Plaintiff, the drawing of an adverse inference against Plaintiff is simply unreliable and would, therefore, be unduly prejudicial, particularly when compared against its minimal probative value. *In re Worldcom*, 377 B.R. at 109 n. 23 (citing FED. R. EVID. 403) ("Although

relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . .").  Similarly, absent a nexus between Mr. Ruble's prior conduct and Plaintiff's reasonable reliance on the transactions at issue here, drawing an adverse inference is simply irrelevant and unduly prejudicial to Sovereign.  *United States v. St. Michaels*, 880 F.2d 579, 601 (1st Cir. 1989) (internal citation omitted) ("Evidence is unfairly prejudicial if it might cause the jury 'to base its decision on something other than the established propositions in the case.'").

## CONCLUSION

For the reasons stated herein, Plaintiff respectfully requests that the Court deny Defendant's motion for leave to depose Mr. Raymond J. Ruble (inmate number 58202-054).  In the alternative, should the Court grant Defendant's motion, Plaintiff reserves its rights, including, but not limited to its right to file a motion in *limine*, to preclude the admissibility of Mr. Ruble's intended exercise of the Fifth Amendment privilege, or any inferences that could be drawn therefrom.

Respectfully submitted this 27th day of April, 2012.

COUNSEL FOR PLAINTIFF

*/s/ Rajiv Madan*
Rajiv Madan, D.C. Bar #463317
John Magee, D.C. Bar #931139
Christopher Bowers, D.C. Bar #468117
Christopher Murphy, D.C. Bar # 500886
Nathan P. Wacker, D.C. Bar # 1004278
BINGHAM MCCUTCHEN LLP
2020 K Street, N.W.
Washington, D.C. 20006
Facsimile:  (202) 373-6001

Email: raj.madan@bingham.com
john.magee@bingham.com
chris.bowers@bingham.com
christopher.murphy@bingham.com
nathan.wacker@bingham.com


James C. McGrath, BBO #564731
Deana K. El-Mallawany, BBO #674825
BINGHAM MCCUTCHEN LLP
One Federal Street
Boston, MA 02110-1726
Telephone:  (617) 951-8000
Facsimile:  (617) 345-8736
Email:  james.mcgrath@bingham.com
deana.el-mallawany@bingham.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 27, 2012.

*/s/ Rajiv Madan*

Rajiv Madan, D.C. Bar #463317
BINGHAM MCCUTCHEN LLP
2020 K Street, N.W.
Washington, D.C. 20006
Telephone:  (202) 373-6000
Facsimile:  (202) 373-6001
Email: raj.madan@bingham.com
