UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-11043-GAO

SANTANDER HOLDINGS USA, INC. & SUBSIDIARIES,
Plaintiff,

v.

UNITED STATES OF AMERICA,
Defendant.

OPINION
October 17, 2013

O'TOOLE, D.J.

Santander Holdings USA, Inc., formerly known as Sovereign Bancorp, Inc., and referred to in this opinion as "Sovereign," has sued to recover approximately $234 million in federal income taxes, penalties, and interest that it claims were improperly assessed and collected by the Internal Revenue Service for tax years 2003, 2004, and 2005 as a consequence of the IRS's disallowance of foreign tax credits claimed by Sovereign for those years. The United States defends the disallowance on the ground that the transaction in which Sovereign incurred and paid the foreign taxes against which the credit was taken was a "sham" conducted not for its real economic value but rather as a contrived means of generating the tax benefit provided by the foreign tax credit.

Sovereign recently moved for partial summary judgment on a linchpin issue: whether a payment Sovereign received in the transaction from its counterparty, Barclays Bank PLC ("Barclays"), should be accounted for as revenue to Sovereign in assessing whether Sovereign had a reasonable prospect of profit in the transaction. It is the government's position that the payment should be excluded from a calculation of Sovereign's pre-tax profit as a "tax effect"

because the payment is an "effective rebate" of U.K. taxes paid by Sovereign. If the payment is excluded, as the government contends it should be, then the transaction at issue does not show a reasonable prospect of profit, but if it is included, as Sovereign contends, it shows a substantial profit to Sovereign from the transaction. This basic binary fact is not genuinely disputed. The existence or not of a reasonable prospect of profit is critical in determining whether the transaction had objective economic substance for purposes of assessing whether it was a "sham" or not. If the payment is counted as pre-tax revenue, it is objectively clear that the transaction has economic substance for Sovereign.

The parties submitted voluminous briefing on the matter and were heard in extended oral argument. At a pretrial conference on September 25, 2013, I announced from the bench that Sovereign's motion for partial summary was being granted. I gave a brief oral statement of my reasoning, promising a more detailed written opinion to come. This is that opinion, and it supersedes the brief oral statement of reasons.

**I.     The STARS Transaction**

Barclays is chartered by the United Kingdom. Together with its adviser, KPMG, Barclays developed and proposed to several U.S. banks, including Sovereign, a "Structured Trust Advantaged Repackaged Securities" ("STARS") transaction. Viewed from 30,000 feet, the STARS transaction was designed to give Barclays substantial benefits under U.K. tax laws, in light of which Barclays could and would offer to lend funds to U.S. banks at a lower cost than otherwise might be available to them. The banks could relend the money in their normal banking operations, using the lower cost either to obtain a competitive advantage or to increase their marginal return on lending or both. Up close, however, the transaction was surpassingly complex and unintuitive; the sort of thing that would have emerged if Rube Goldberg had been a tax

accountant. The government might be forgiven for suspecting that the designers of anything this complex must be up to no good, but that understandable instinctive reaction is not a substitute for careful analysis, and on careful analysis, the government's position does not hold up.

A very brief overview of the transaction is sufficient for present purposes. Sovereign created a trust to which it contributed $6.7 billion of income generating assets. The trustee of the trust was purposely made a U.K. resident, causing the trust's income to be subject to U.K. income taxation at a rate of 22 percent. The trust income was also subject to U.S. income taxation and was attributed to Sovereign, but with a credit available for the amount paid in U.K. income taxes under section 901 of the Internal Revenue Code ("the Code"). 26 U.S.C. § 901. Sovereign paid U.K. taxes and then claimed credits for the amounts paid in calculating its U.S. income tax liability for the tax years in question.

The transaction included a number of contrived structures and steps that, each viewed in isolation, would make little or no sense. For example, Barclays had an ownership interest in the trust and as a result received monthly distributions from the trust, which, under the terms of the transaction, it was required immediately to re-contribute to the trust. Standing in isolation, this circular movement of distributions would make no sense. In the context of the entire transaction, however, it was crucial to Barclays' obtaining favorable tax treatment under U.K. law, which gave it the ability to lower its effective lending rate to a U.S. bank. The result of the STARS transaction for Barclays was a net tax *gain*, which it was able to use to reduce other U.K. tax liabilities that it owed. [1]

---

[1] Whether Barclays' maneuvers abused any U.K. tax laws is not an issue here. In any event, it appears from the record that the U.K. tax authorities were well aware of the STARS transaction and made no objection.

The loan aspect of the transaction was also highly structured in an idiosyncratic way, although it was consistently treated by Sovereign for accounting and regulatory purposes as a secured loan, acceptably to regulating agencies, including the Securities and Exchange Commission and the Office of Thrift Supervision. One feature of the loan arrangements was what was denominated the "$b_x$ payment," or the "Barclays payment."[2] It was calculated as approximately one-half of the amount Sovereign paid in taxes to the U.K. on the income earned by the trust. While in the intricacies of the transaction it was actually a monthly credit to Sovereign figured into its interest costs, the government refers to it as an affirmative payment in support of its "effective rebate" argument, and Sovereign accepts that characterization for purposes of this motion.[3]

## II.  Discussion

There is no dispute that for the years in question Sovereign incurred and paid U.K. taxes on the trust income, also reported the income on its U.S. tax returns, but claimed a foreign tax credit for the amount it paid to the U.K. There is no claim by the government that the foreign tax credit was improperly calculated or that Sovereign failed to comply with any applicable provision of statute or regulation relative to it. Rather, the government's position is that Sovereign did not *in substance* pay the U.K. taxes claimed because the Barclays payment was an "effective rebate" of one-half of Sovereign's U.K. taxes. In other words, the Barclays payment effectively relieved Sovereign of half the burden of its U.K. taxes.

---

[2] The term "$b_x$" comes from the elaborate formulae used by the parties to the transaction to calculate various values. (See, e.g., Pl.'s Mem. in Supp. of Mot. for Partial Summ. J., Ex. 7 (dkt. no. 125-7) ("Amended and Restated Formulae Letter,").)

[3] Sovereign also accepts, for purposes of the motion only, that the STARS transaction can be bifurcated into trust and loan transactions, so that the trust transaction can be evaluated without including the loan transaction. Its broader view in the litigation is that the trust and loan components must be evaluated together.

In order to challenge what would otherwise be a valid claim of a foreign tax credit, the government reaches for its trump card – the "economic substance" doctrine. Cf. In re CM Holdings, Inc., 301 F.3d 96, 102 (3d Cir. 2002) (referring to the economic substance doctrine as the government's "trump card"). Literal compliance with the letter of the Code and regulations may be disregarded if it appears that the transaction in question had no economic substance but was simply a tax-avoiding contrivance. Gregory v. Helvering, 293 U.S. 465, 470 (1935). The same principle has been articulated variantly as the "substance over form" doctrine, see Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978), the "sham transaction" doctrine, see IES Indus., Inc. v. United States, 253 F.3d 350, 353 (8th Cir. 2001), and even the "sham in substance" doctrine, see Dewees v. C.I.R., 870 F.2d 21, 29 (1st Cir. 1989). The principle is the same regardless of the label: if a transaction has no legitimate, non-tax business purpose and thus, apart from expected tax benefits, has no genuine economic substance, it may be disregarded for purposes of assessing taxes. See CM Holdings, 301 F.3d at 103 ("The main question these different formulations address is a simple one: absent the tax benefits, whether the transaction affected the taxpayer's financial position in any way."). A transaction will be found to have economic substance if it had "a reasonable possibility of a profit." Fid. Int'l Currency Advisor A Fund, LLC, by Tax Matters Partner v. United States, 747 F. Supp. 2d 49, 231 (D. Mass. 2010), aff'd sub nom. Fid. Int'l Currency Advisor A Fund, LLC ex rel. Tax Matters Partner v. United States, 661 F.3d 667 (1st Cir. 2011).

The government says the Barclays payment was not "in substance" a payment by Barclays at all, but rather it was "effectively" a rebate of taxes originating from the U.K. tax authorities. The theory is that Barclays was only able to make the payment because of the tax credits *it* had received from the U.K.

The argument is wholly unconvincing. In the first place, the Code and regulations contain explicit provisions addressing when a foreign tax may be considered rebated by the taxing authority and when a taxpayer may be considered to have received a subsidy (a rebate is a type of subsidy) from a foreign source to pay its foreign taxes. Under the Code,

> Any income, war profits, or excess profits tax shall not be treated as a tax for purposes of this title to the extent-- **(1)** the amount of such tax is used (directly or indirectly) by the country imposing such tax to provide a subsidy by any means to the taxpayer, a related person (within the meaning of section 482), or any party to the transaction or to a related transaction, and **(2)** such subsidy is determined (directly or indirectly) by reference to the amount of such tax, or the base used to compute the amount of such tax.

26 U.S.C. § 901(i)(1)-(2). Treasury Regulations provide:

> An amount is not tax paid to a foreign country to the extent that it is reasonably certain that the amount will be refunded, credited, rebated, abated, or forgiven. It is not reasonably certain that an amount will be refunded, credited, rebated, abated, or forgiven if the amount is not greater than a reasonable approximation of final tax liability to the foreign country.

26 C.F.R. § 1.901–2(e)(2). Further,

> **(i) General rule.** An amount of foreign income tax is not an amount of income tax paid or accrued by a taxpayer to a foreign country to the extent that-- (A) The amount is used, directly or indirectly, by the foreign country imposing the tax to provide a subsidy by any means (including, but not limited to, a rebate, a refund, a credit, a deduction, a payment, a discharge of an obligation, or any other method) to the taxpayer, to a related person . . . , to any party to the transaction, or to any party to a related transaction; and
> (B) The subsidy is determined, directly or indirectly, by reference to the amount of the tax or by reference to the base used to compute the amount of the tax.
> **(ii) Subsidy.** The term "subsidy" includes any benefit conferred, directly or indirectly, by a foreign country to one of the parties enumerated in paragraph (e)(3)(i)(A) of this section. *Substance and not form shall govern in determining whether a subsidy exists.* The fact that the U.S. taxpayer may derive no demonstrable benefit from the subsidy is irrelevant in determining whether a subsidy exists.

26 C.F.R. § 1.901–2(e)(3) (emphasis added). In pretrial discovery, the government abjured any claim that the Barclays payment was a subsidy under these provisions. (See Pl.'s Mem. in Supp.

6

of Mot. for Partial Summ. J., Ex. 4 at 16 (dkt. no. 125-4) ("Response to Interrogatory No. 41").) As the emphasized sentence indicates, that concession must be understood to mean that the Barclays payment was not "in substance" a subsidy.

Nevertheless, the government presses its argument that the Barclays payment was "in substance" a rebate from the U.K. But the government can point to no governing or precedential legal authority that supports treating the private payment between Barclays and Sovereign as a payment from the U.K. treasury, because there is none. It has some decisions at the first-instance level that have generally accepted its theory about the STARS transaction, but as this opinion explains, I find those decisions unpersuasive.

Lacking compelling legal authority, the government proffers the learned opinions of its putative expert witnesses. The problem is that their opinions do not matter, because the necessary question is not a question of fact – What happened? – but rather a question of law – How should what happened be classified for purposes of applying the law? That is why this issue is amenable to resolution on a motion for summary judgment. The facts of the transaction are not in dispute. There is no material factual issue about how the credits and debits worked their labyrinthine way through the Goldbergian apparatus. The question is, Should the Barclays payment be treated, as a matter of law, as if it were a rebate from the U.K. to Sovereign? That is a legal question, to be answered by judges, not economists. See IES, 253 F.3d at 351 ("The material facts are undisputed; the question of law before us is the general characterization of a transaction for tax purposes.").

The Barclays payment was certainly not an *actual* rebate by the U.K.[4] Nor is there any reason to treat it as an "effective" or constructive rebate. There is no authority to do so. On the contrary, the terms "taxes" and "tax credits" are properly understood to refer to transactions between a taxpayer and a taxing authority, not transactions between private parties, even if the "effect" is to lessen for a taxpayer the economic burden of having paid the tax. See Doyon, Ltd. v. United States, 37 Fed. Cl. 10, 22-24 (1996), rev'd on other grounds, 214 F.3d 1309 (Fed. Cir. 2000). In Doyon, the Court of Federal Claims rejected a taxpayer's argument that certain payments to it from other private parties should have been allowed as an adjustment to its net book income for tax purposes because the payments were effectively the same as a tax item in substance. Contrary to its argument in this case, the government contended in Doyon that "amounts paid between private parties pursuant to private contracts are not and cannot be 'federal income taxes'" within the meaning of the applicable Code provision and related regulations. Id. at 17 (summarizing the government's contention). The court there agreed with the government that private payments were not tax items, concluding that "an item of federal tax benefit is an abatement of liability under the revenue laws," and further that even if the federal Treasury could be regarded as the "ultimate source" of the private party payment, the payment was still private and therefore not a tax item. Id. at 22-23. Sovereign also cites some private letter rulings that similarly look to whether the taxing authority was actually a party to a transfer of a payment or credit, and not to the economic substance of the event, to determine whether the matter was a tax item or a private transaction. See I.R.S. Priv. Ltr. Rul. 2009-51-024 (Dec. 18, 2009); I.R.S. Priv. Ltr. Rul. 2003-48-002 (Nov. 28, 2003); I.R.S. Priv. Ltr. Rul. 87-42-010 (July 10, 1987).

---

[4] There is no dispute that the U.K. tax authorities did not authorize or participate in any way in the actual calculation or execution of the Barclays payment.

Slight as this authority may be, it is enough to outweigh the government's authority for its proposition that a private payment may be recharacterized into a tax item, which is nil. The recent decisions in similar STARS cases do not discuss the issue. See Salem Fin., Inc. v. United States, -- Fed. Cl. --, 2013 WL 5298078, at *39-40 (Sept. 20, 2013); Bank of N.Y. Mellon Corp. v. C.I.R., 140 T.C. 15, 40-43 (Feb. 11, 2013). Those cases appear to deal with the question whether the Barclays payment was "in substance" a "tax effect" as a matter of *fact*, rather than as a matter of *law*, as I conclude is proper. In other words, they accept the testimony of the government's experts and make a factual finding that the Barclays payment was an effective U.K. tax rebate and consequently a U.S. tax effect. Salem Fin., 2013 WL 5298078, at *40; Bank of N.Y., 140 T.C. at 43. Notably, they do not address the legal question whether a private party payment between Barclays and the relevant bank can properly be classified as a tax effect because it is so much like one in substance, a question that Doyon and the private letter rulings answer in the negative.

Moreover, the Code and regulations have addressed the issues of rebates and subsidies and stopped short of any concept of "constructive" or "effective" rebate. If there were to be such a new principle adopted, and it would be a new principle, it would be better done through the legislative and rulemaking processes where the focus is broad, rather than through adjudication where the focus is particular and possibly outcome-driven.

The economic substance doctrine allows the government to look beyond technical compliance with the Code to ascertain the real nature of the transaction at issue. However, economic substance still must be assessed in adherence to accepted and usual legal and accounting principles. See Compaq Computer Corp. & Subsidiaries v. C.I.R., 277 F.3d 778, 784-86 (5th Cir. 2001). Otherwise, the government's "trump card" would acquire too much potency.

Here, treating the Barclays payment as revenue to the taxpayer is not a manipulative distortion of the tax rules to achieve merely technical compliance, but rather is fully consistent with not only the letter but the substance of the IRS's own regulations and existing case law. See Compaq Computer Corp. & Subsidiaries, 277 at 784-85 (collecting cases); IES Indus., Inc., 253 F.3d at 354; 26 U.S.C. § 61(a)(12); 26 C.F.R. § 1.901–2(f)(1)-(2)(i).

Barclays' assumption of part of Sovereign's tax liability is properly regarded as income to Sovereign. It is a hoary principle dating to the earliest days of the income tax that taxes paid on behalf of a taxpayer are counted as income to the taxpayer. Old Colony Trust Co. v. C.I.R., 279 U.S. 716, 729 (1929). It is still vital. See IES Indus., Inc. v. United States, 253 F.3d 350, 354 (8th Cir. 2001); accord Compaq Computer Corp. & Subsidiaries, 277 F.3d at 784.

This principle is also reflected in the IRS's own regulations. Treas. Reg. § 1.901-2(f)(1) provides:

> The person by whom tax is considered paid for purposes of sections 901 and 903 is the person on whom foreign law imposes legal liability for such tax, even if another person (e.g., a withholding agent) remits such tax. . . . [T]he person on whom foreign law imposes such liability is referred to as the "taxpayer."

Further, Treas. Reg. § 1.901-2(f)(2) provides:

> Tax is considered paid by the taxpayer even if another party to a direct or indirect transaction with the taxpayer agrees, as a part of the transaction, to assume the taxpayer's foreign tax liability.

The government makes no attempt to explain why the Old Colony principle or these regulations should not apply. See Compaq Computer Corp. & Subsidiaries, 277 F.3d at 784 (finding economic substance based on the Old Colony principle; "the payment of Compaq's Netherlands tax obligation by Royal Dutch was income to Compaq."). Rather, it apparently asks the Court to apply a new ad hoc theory to the STARS transactions, even if that means ignoring long established principles, including those it has embraced in its regulations and advocated in

10

prior cases. Those principles hold that payments between private parties, even if they are buying and selling tax credits, are income to be accounted for on a pre-tax basis. Under those principles, the Barclays payment is properly accounted for as pre-tax income to Sovereign, and not as a tax rebate.

The government also advances a more generalized "sham" argument, as it did in the Bank of New York and Salem Financial cases. Under this broad view, the whole STARS transaction was concocted to manufacture a bogus foreign tax credit for Sovereign. There was no legitimate business purpose or economic substance to the transaction, the argument goes, except to create the conditions under which Sovereign could claim the foreign tax credit on its U.S. returns. The courts in the other cases apparently were persuaded to that position, but I am not. In part the argument is foreclosed by what has just been explained. If the Barclays payment is included in the calculation of pre-tax profitability, then there was a reasonable prospect of profit as to the trust transaction, giving it economic substance. But in any event, unless the "effective rebate" theory is credited, Sovereign's payment of the U.K. tax and claiming of the U.S. foreign tax credit did not produce an improper tax benefit; rather, it was simply a wash. Even if the Barclays payment was intended to be and was the assumption of part of Sovereign's U.K. tax burden (which Sovereign concedes for the purposes of this motion), Sovereign is nonetheless treated as having paid the full U.K. tax for purposes of the foreign tax credit. See Treas. Reg. § 1.901-2(f)(1), (2). It was thus entitled to claim the foreign tax credit on its U.S. returns. It is true that the U.K. received an amount in taxes from Sovereign that but for the transaction would have gone to the U.S. Treasury, but that transfer produced no advantage to Sovereign. It was still out the same amount of tax, regardless of which country it was paid to.

One final matter. It might be suggested that the "economic substance" or "substance over form" test requires, in addition to an assessment of the objective economic realities of a transaction, an inquiry into the subjective motivation or purpose of the taxpayer, and that this need for a subjective inquiry raises fact issues that should preclude summary judgment. I disagree.

It is clear that cases dealing with the economic substance question *always* assess the objective economic reality of the transaction to determine whether it is in actuality a legitimate or a "sham" transaction. *Sometimes* the cases also assess the taxpayer's subjective purpose or motivation, and they often give that assessment different degrees of significance in their ultimate judgment. Older First Circuit cases seem to emphasize reliance on objective assessment virtually to the exclusion of subjective assessment. Stone v. C.I.R., 360 F.2d 737, 740 (1st Cir. 1966); Fabreeka Prods. Co. v. C.I.R., 294 F.2d 876, 878-79 (1st Cir. 1961); Granite Trust Co. v. United States, 238 F.2d 670, 678 (1st Cir. 1956). Both parties try to find advantage in then-Judge Breyer's opinion in Dewees v. C.I.R., 870 F.2d 21 (1st Cir. 1989), Sovereign arguing that a close reading shows that the court confirmed the Circuit's prior objective-only approach, the government, relying on the opinion of Judge Saylor in Fid. Int'l Currency Advisor A Fund, LLC, 747 F. Supp. 2d at 228-31, arguing that a more expansive reading indicates that Dewees "effectively" (there is that word again) overruled the prior cases. I find neither position completely persuasive. The "sham in substance" doctrine was not a central focus of the decision in Dewees, and my own reading of the opinion does not leave me with the sense that the court was trying to lay out a full statement of the doctrine, either in light of the prior cases or in spite of them.

If the First Circuit has occasion to address the doctrine again (as I suspect it will), I would guess that it would perhaps move a bit away from a rigid "objective only" test to one that is primarily objective but has room for consideration of subjective factors where necessary or appropriate. Nonetheless, in the circumstance where it found that the objective assessment established that the transaction *lacked* economic substance independent of tax considerations, the court did say that a subjective inquiry may be dispensed with. Dewees, 870 F.2d at 35 ("Where the objective features of the situation are sufficiently clear, [the Tax Court] has the legal power to say that self-serving statements from taxpayers could make no legal difference . . . ."). In light of that dispensation, I would not expect it to insist on consideration of the subjective intent of a taxpayer where the transaction is objectively judged *to have had* economic substance. More specifically, I have no reason to think that the First Circuit would be inclined to follow the Sixth Circuit's proposition stated in Dow Chem. Co. v. United States, that "[i]f the transaction has economic substance, 'the question becomes whether the taxpayer was motivated by profit to participate in the transaction.'" 435 F.3d 594, 599 (6th Cir. 2006) (quoting Illes v. C.I.R., 982 F.2d 163, 165 (6th Cir. 1992)).[5] Obviously, I do not follow that proposition here. For this reason, there is no need for a trial to conduct a subjective inquiry.

For the foregoing reasons, Sovereign's motion for partial summary judgment (dkt. no. 124) has been granted.

/s/ George A. O'Toole, Jr.
United States District Judge

---

[5] The Sixth Circuit's position in this respect is of dubious provenance. It traces back to a rather summary opinion in Mahoney v. C.I.R., 808 F.2d 1219 (6th Cir. 1987), which, like Dewees, was concerned with the "entered into for profit" language of Code § 165(c). The Mahoney court apparently thought that statutory phrase required consideration of a subjective motive. That will not always be necessary, and perhaps even never so, in the broader, Gregory-based inquiry into economic substance.