UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-11043-GAO

SANTANDER HOLDINGS USA, INC. & SUBSIDIARIES,
Plaintiff,

v.

UNITED STATES OF AMERICA,
Defendant.

OPINION AND ORDER
November 13, 2015

O'TOOLE, D.J.

Santander Holdings USA, Inc., formerly known as Sovereign Bancorp, Inc., and referred to in this opinion as "Sovereign," has sued to recover approximately $234 million in federal income taxes, penalties, and interest that it claims were improperly assessed and collected by the Internal Revenue Service for tax years 2003, 2004, and 2005 as a result of the IRS's disallowance of foreign tax credits claimed by Sovereign for those years. The tax credits were claimed as a consequence of Sovereign's participation in a "Structured Trust Advantaged Repackaged Securities" ("STARS") transaction that was sponsored by Barclays Bank PLC. The STARS transaction has been summarized by this Court, see Santander Holdings USA, Inc. & Subsidiaries v. United States, 977 F. Supp. 2d 46, 48-49 (D. Mass. 2013), and other courts, see Bank of N.Y. Mellon Corp. v. Comm'r, 801 F.3d 104, 110-12 (2d Cir. 2015), petitions for cert. filed (U.S. Oct. 13, 2015) (No. 15-478); (U.S. Nov. 2, 2015) (No. 15-572); Salem Fin., Inc. v. United States, 786 F.3d 932, 937-39 (Fed. Cir. 2015), petition for cert. filed (U.S. Sept. 29, 2015) (No. 15-380); Wells Fargo & Co. v. United States, No. 09-CV- 2764, 2015 WL 6962838 (D. Minn. Nov. 10, 2015), and there is no need to repeat the description here. Familiarity with those summary descriptions is assumed.

This Court previously granted Sovereign's motion for partial summary judgment as to whether the "Barclays payment" (also known as the "$b_x$ payment") should be accounted for as revenue to Sovereign in assessing whether Sovereign had a reasonable prospect of profit in what the parties refer to as the "trust transaction." I agreed with Sovereign that the Barclays payment should be accounted for as pretax revenue, which meant that the trust transaction showed a reasonable prospect of profit and therefore did not, as the government had argued, lack economic substance. In reaching that conclusion, I rejected the government's argument that the Barclays payment should be treated as an "effective rebate" of U.K. taxes paid by Sovereign and thus a "tax effect" that should not be taken into account in determining Sovereign's pretax revenues from the trust transaction and consequently the transaction's prospect of profit. Santander Holdings, 977 F. Supp. 2d at 50-53.

Thereafter, Sovereign moved for summary judgment on Counts One, Two, Three, and Seven of its Amended Complaint. Counts One through Three are claims for refunds of taxes paid in 2003, 2004, and 2005, respectively, and Count Seven is a claim for a refund of deficiency interest assessed by the IRS.[1]

The government opposed Sovereign's motion and cross-moved for partial summary judgment in its favor on the following issues: "(1) whether the step transaction doctrine applies to require some or all of the steps of Sovereign's STARS Trust be disregarded for federal income tax and for U.S.-U.K. Tax Treaty purposes; (2) whether the conduit doctrine applies to require the Sovereign's STARS Trust be treated as a mere conduit, and, as a consequence, be disregarded for federal income tax and for U.S.-U.K. Tax Treaty purposes[;] and (3) whether a full computation

---

[1] If Sovereign succeeds on the first three Counts, it acknowledges that Counts Four, Five, and Six, which present alternative claims, will be moot.

of Sovereign's potential profit from the STARS transaction requires . . . [the income from the Barclays payment to] be reduced by the costs incurred to earn it, most notably, Sovereign's payment of U.K. trust tax." (United States' Cross Mot. for Partial Summ. J. at 1 (dkt. no. 249).) The government also objected that summary judgment in Sovereign's favor was inappropriate because there remained issues of fact as to whether the STARS loan transaction lacked economic substance. I address these issues in reverse order.

## I.        The Economic Substance of the Loan Transaction

There is no factual dispute that in the STARS loan transaction, Sovereign borrowed from Barclays over a billion dollars that it used in its banking operations. I agree with both the Second and Federal Circuits, as well as the Tax Court, that this fact by itself is sufficient to reject the claim that the loan lacked economic substance, even when the loan transaction is considered apart from the trust transaction. See Bank of N.Y. Mellon, 801 F.3d at 123-24 (affirming Bank of N.Y. Mellon Corp. v. Comm'r, 106 T.C.M. (CCH) 367 (T.C. 2013)); Salem Fin., 786 F.3d at 957.

As the Federal Circuit noted, the STARS transaction as originally designed was marketed to non-bank businesses and did not include a loan transaction, and Barclays was unsuccessful in attracting interested companies. Salem Fin., 786 F.3d at 936, 957. The design was modified to include a loan transaction, and banks then became interested, as these cases demonstrate. It is an obvious and fair conclusion that it was the economic value of the loan that attracted their attention.

The government points out that the nominal loan interest rates on both the original borrowing and the extension were higher than rates available to Sovereign for conventional (that is to say, non-STARS) borrowing. Even so, to say that the loan was priced too high[2] is not the

---

[2] Of course, the loan can only be considered to be priced too high if one looks only at its nominal rate, and not at its effective rate if the Barclays payment is included in the analysis. But even

equivalent of saying that it lacked any economic substance. As both the Second and Federal Circuits recognized, see Bank of N.Y. Mellon, 801 F.3d at 123-24; Salem Fin., 786 F.3d at 957, it was a real loan. It furnished the bank with capital to invest in its business that had to be paid back. It was a substantive economic transaction.[3]

## II.    Economic Substance of the Trust Transaction, Redux

In ruling on the prior motion for partial summary judgment, I concluded that the Barclays payment should be accounted for as revenue to Sovereign in assessing whether there was a reasonable prospect of profit in the trust transaction because the payment was properly regarded as income under the principle established in Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 729 (1929). Santander Holdings, 977 F. Supp. 2d at 52-53. In doing so I rejected the government's argument that the Barclays payment should be excluded from a pretax profit analysis because it was in substance a rebate of part of Sovereign's U.K. taxes and thus a "tax effect" properly omitted from pretax evaluations.

The government also argued that Sovereign's U.K. tax payments should be factored into the pretax profitability assessment not because they were taxes but because they were an economic cost. (See Def. United States' Resp. in Opp'n to Pl.'s Mot. for Partial Summ. J. at 48-49 (dkt. no. 134).) That argument was also implicitly rejected, although it was not specifically addressed in the opinion. The government renews the argument here, and I now explain why I reject it.

---

viewed through the lens of bifurcation, price is not the only measure of whether there was a transaction with genuine economic substance.
[3] "The general characterization of a transaction for tax purposes is a question of law subject to review." Frank Lyon Co. v. United States, 435 U.S. 561, 581 n.16 (1978); accord IES Indus., Inc. v. United States, 253 F.3d 350, 351 (8th Cir. 2001).

It is true, as the government argues, that the STARS transaction is different from the transactions at issue in Compaq Computer Corp. v. Commissioner, 277 F.3d 778 (5th Cir. 2001), and IES Industries, Inc. v. United States, 253 F.3d 350 (8th Cir. 2001), which were discussed in the prior ruling regarding the inclusion of the Barclays payment as income in assessing the prospect of pretax profitability. The tax payments at issue in those cases were payments of Netherlands withholding taxes on dividends received by the taxpayers. In other words, they were the taxes paid as a direct consequence of the taxable events that occurred in the course of the arbitrage transactions. In contrast, Sovereign's U.K. tax payments were not occasioned by the receipt of the Barclays payment; they were income taxes incurred by reason of Sovereign's contribution of income-earning assets to the STARS trust, thus subjecting the trust income to U.K. taxation because the trustee was deemed to be a U.K. resident under U.K. law (and the U.S.-U.K. tax treaty). So the government is correct that the Compaq and IES cases do not directly answer the question of whether to treat the payment of U.K. taxes as an expense attributable to the receipt of the Barclays payment.

That said, Sovereign's U.K. tax payments are not properly regarded as an actual economic cost for the Barclays payment to be figured in a profitability assessment. The assets Sovereign contributed to the trust were earning income and Sovereign was being taxed on that income before the STARS transaction. After the contribution of the assets to the STARS trust, they continued to earn income and Sovereign continued to be taxed on that income. Sovereign's tax burden with respect to the income produced by the trust assets was not affected by the contribution of the assets to the trust. What was changed was that Sovereign was paying taxes on the income from the contributed assets to the U.K. rather than to the U.S. Indeed, it is one of the government's rhetorical flourishes that the STARS transaction "diverted" to the U.K. tax payments that should have gone

to the U.S. Treasury, as if the whole point of the purported tax avoidance scheme was to generate an undeserved foreign tax credit and thus to avoid paying a certain amount in taxes to Uncle Sam by paying an equal amount to John Bull. In other words, there is no dispute that Sovereign's overall income tax payments were not increased as a consequence of the transaction. Cf. Wells Fargo, 2015 WL 6962838, at *3 (describing bank's combined tax payments as a "wash"). Put another way, there was no increased *income tax cost* as a consequence of Sovereign entering into the STARS transaction. The cost was simply divided between two taxing authorities, rather than going all to one.

It is therefore inaccurate to say that Sovereign "paid for" the Barclays payment by paying taxes to the U.K. It is certainly true that Sovereign's subjecting the assets contributed to the trust to U.K. taxation was one of the necessary conditions to the generation of Barclays' U.K. tax savings and therefore to the ultimate receipt by Sovereign of the Barclays payment. But the condition was not that Sovereign pay any additional amount in income taxes but rather that it pay income taxes *to the U.K.* The condition was not economic in its essence, but jurisdictional.[4] The only true economic cost to Sovereign of establishing that necessary jurisdictional condition would have been the transaction costs incurred in negotiating and executing the deal. They were not large enough to alter the prospect of profit in the trust transaction.

Lastly, even if the U.K. taxes were to be treated as an expense to be properly considered in a profitability analysis, it would then be necessary also to consider the effect of the offsetting U.S. foreign tax credit. To do otherwise "is to stack the deck against finding the transaction profitable." Compaq, 277 F.3d at 785. "To be consistent, the analysis should either count all tax effects or not

---

[4] Cf. Salem Fin., 786 F.3d at 945 ("The [Barclays] payments were made in consideration of BB&T's services rendered under the STARS transaction, including BB&T's acts of creating the STARS Trust and subjecting its U.S.-based assets to U.K. taxation.").

count any of them." Id. The government's argument is circular; it assumes what it seeks to prove: The foreign tax credit should be ignored for purposes of the profitability analysis. Ignoring it, but considering the U.K. taxes paid, the analysis shows lack of a prospect of profit. The transaction thus lacked economic substance. Therefore the foreign tax credit should be ignored. [5] Put bluntly, the government's bootstrap position is that the tax payment should be included and the tax credit excluded because if that is done, the transaction appears to lack economic substance. It seems that the Second Circuit was persuaded by that argument. See Bank of N.Y. Mellon, 801 F.3d at 118-19.[6] I am not, and apparently the Federal Circuit was not either. See supra note 4.

For these reasons, the amounts paid to the U.K. in taxes by Sovereign should not be included as offsetting costs in an analysis of the prospect of pretax profitability of the trust transaction.

## III.    Substance over Form Doctrines

It is undisputed that because the trustee of the STARS trust was a resident of the U.K., the trust's income was subject to U.K. taxation. It is undisputed that for the years in question Sovereign actually paid taxes on the trust's income to the U.K.[7] It is undisputed that the U.K. tax authorities

[5] The court in Wells Fargo seems to make the same circularity error. In describing the STARS transaction in the beginning of its order, the court starts with the observations that "Wells Fargo effectively shifted some of its tax payments out of the U.S. treasury and into the U.K. treasury," 2015 WL 6962838, at *2, that "STARS took money out of the pocket of the U.S. treasury and put that money into the pockets of Wells Fargo, Barclays, and U.K. treasury," id. at *3, and that "the U.S. treasury funded all of the profits of the STARS transaction," id. at *4. Those characterizations seem more appropriate to the end of the analysis than the beginning.
[6] With all respect, the court's statement that "the trust transaction in BNY had little to no potential for economic return apart from the tax benefits," id. at 119, is not a reason for including tax payments and excluding tax credits but rather a conclusion about what happens if the payments are included and the credits are excluded.
[7] It is also undisputed that Sovereign, the parent, disregarded subsidiary entities, including the trust, for U.S. tax purposes, and that it treated the trust income as income to it, and paid both the U.K. and U.S. taxes on that income.

did not rebate any portion of the taxes paid, and I have ruled that the Barclays payment is not properly regarded as an "effective rebate" by Barclays of the trust's U.K. taxes. <u>Santander Holdings</u>, 977 F. Supp. 2d at 51-53. Accordingly, it is established that, at least as a prima facie matter, Sovereign was entitled to claim a foreign tax credit under Section 901 of the Internal Revenue Code and related statutory and regulatory provisions for the amounts of foreign tax actually paid to the U.K. for the years in question. 26 U.S.C. § 901 et seq.

Because, as I have said, the Barclays payment was not "in substance" a rebate of U.K. taxes, it was not, therefore, a tax item or effect. A necessary reciprocal corollary of that prior ruling is that Sovereign "in substance" paid all its U.K. income taxes. Payment of foreign taxes is the essential prerequisite to its claim of a foreign tax credit in like amount against its U.S. tax obligations. As Sovereign has pointed out, the government has not proffered any statutory, regulatory, or judicial authority supporting the denial of a credit under Section 901 when as a matter of fact the taxpayer has "in substance"—i.e., actually—paid a foreign tax of the kind designated as eligible for the credit.

Ironically, the government invokes two "substance over form" doctrines—the "step transaction" and the "conduit" doctrines—to support its argument that the substance of Sovereign's actual payment of U.K. taxes should be ignored in assessing whether Sovereign properly claimed foreign tax credits. Briefly, those doctrines hold that transactions that proceed through multiple steps or involve the interaction of a sequence of multiple entities ("conduits") or both can be examined at each step and as to each entity to see whether the step or the entity is included for a genuine business or economic non-tax reason or whether the step or entity is employed only to contrive a tax benefit that a more direct transaction would not yield. The doctrines cannot help the government as it proposes.

8

First, for purposes of Sovereign's payment of its U.S. taxes, the doctrines are beside the point. The STARS trust created by Sovereign was "disregarded" for U.S. tax purposes, as authorized under Treasury Regulation § 301.7701-2(a). (Pl.'s Mem. of Law in Supp. of Mot. for Partial Summ. J. Ex. 4 (Aff. Of Kurt J. Swartz) at 3 (dkt. no. 127-5).) Consequently, all of the trust's income, expenses, liabilities, and assets were treated for tax purposes as owned directly by Sovereign. Accordingly, for U.S. tax purposes, there are no steps to collapse or conduits to ignore. Neither the existence of the trust nor the fact that its trustee was a U.K. resident factored into the computation of Sovereign's U.S. tax obligations.

Nor do the step transaction and conduit doctrines provide a basis for disregarding Sovereign's actual payment of U.K. taxes. The doctrines permit ignoring unnecessary steps or entities. Their justification—that the real, and not artificial, nature of transactions is to be evaluated—does not extend to disregarding events with real economic consequences such as Sovereign's actual payment of real money in taxes to the U.K.

It is understandable that the circular STARS trust-Barclays distributions and recontributions that led to Barclays' obtaining a substantial benefit under U.K. tax laws have aroused instincts of disapproval in people familiar with how American judicial anti-abuse doctrines operate as a bulwark against the manipulation of the U.S. tax code to produce unintended tax benefits. But there is nothing in this case that suggests that Barclays' obtaining of that substantial benefit was anything other than fully in accord with U.K. tax law, or that that country's tax law was abusively manipulated. Apparently, unlike U.S. law, U.K. tax law tends primarily to recognize the *form* of a transaction, and does not generally engage in substance over form recharacterization. It is undisputed in this case that the U.K. tax authorities did not challenge the Barclays-trust machinations as illegitimate under U.K. law.

What the government argues for is application of U.S. judicial doctrine to examine the computation of Barclays' U.K. tax liability. The argument itself is a bit of misdirection. As noted, the steps and conduits involved in the STARS transaction affected *Barclays'* U.K. tax liabilities (and benefits), not Sovereign's. It should be remembered that the STARS transaction was developed by Barclays and marketed to U.S. banks, including Sovereign. It was Barclays that was interested in obtaining tax benefits under its own domestic law. The STARS transaction was not developed because U.S. taxpayers were looking for ways to game the U.S. tax code. The participating banks simply counted on the foreign tax credit to assure tax neutrality.

Moreover, unlike many circumstances in which the anti-abuse doctrines are used to collapse or ignore meaningless steps and conduits, the participants in the STARS trust-Barclays transaction were arm's length counterparties, not related entities. They had their own distinct interests. Barclays was interested in tax benefits it could obtain under U.K. law, in exchange for which it was prepared to pay a U.S. bank counterparty for its cooperation in a transaction that would produce those benefits. Separately, the bank counterparty was interested in lower cost borrowing. In other words, the act of voluntarily "subjecting itself" to U.K. taxes was Sovereign's quid for Barclays' quo.[8] There was a genuine non-tax, business purpose for Sovereign's participation in the STARS transaction.

The government argues that Sovereign agreed with Barclays to participate in the STARS transaction in order to "generate" a foreign tax credit under Section 901. But it is fanciful to say that Sovereign had a U.S. tax motive. In the first place, as already noted, Sovereign effectively paid the same total amount in income taxes as it would have without the STARS transaction. It is just that as a result of the transaction, it paid that same amount to two different taxing authorities.

---

[8] See supra note 4.

It did not *avoid* any tax or reduce its income tax cost. Similarly, it makes no sense to say that Sovereign's motive was to "divert" tax payments from the U.S. to the U.K., just so that it could get an aliquot credit against its U.S. tax bill. Not only would that wash flow be pointless in and of itself, but transaction costs would necessarily make it uneconomical.

*Of course* Sovereign took into account in deciding to participate in the STARS transaction that the U.S. tax code provides a credit for amounts of foreign income taxes paid, and *of course* it would not likely have participated in the transaction if it expected to be doubly taxed on the trust's income. The fact that it considered the credit does not mean that its motive was simply to obtain the credit. What keeps tax lawyers in business is that people have to consider the tax consequences of the actions they take. See Frank Lyon Co. v. United States, 435 U.S. 561, 580 (1978) ("The fact that favorable tax consequences were taken into account by Lyon on entering into the transaction is no reason for disallowing those consequences. We cannot ignore the reality that the tax laws affect the shape of nearly every business transaction."). A person making an economic decision about whether to rent or buy a house may consider that the mortgage interest deduction makes buying more financially attractive. Expecting the tax benefit does not make deciding to buy a house a tax-motivated decision. It is likely that every U.S. taxpayer that has foreign income subject to foreign taxation considers the benefit of the foreign tax credit before undertaking the transaction that will generate that income. The characterization the government uses to condemn Sovereign's actions in the STARS transaction is not limited to the STARS transaction; it logically applies any time a business intentionally "subjects itself" to foreign taxation in the course of its business operations.

Moreover, the objection that Sovereign did not engage in "purposive activity" is incorrect. As has been discussed, it borrowed money at a cost that was in the end advantageous, and as previously discussed, the STARS transaction, taken either as bifurcated or as a whole, had substantial economic value to Sovereign.

As the foregoing indicates, I take a substantially different view of the issues from that taken by other courts that have considered the government's arguments about whether the STARS transaction should be declared abusive insofar as U.S. tax law is concerned. Let me recap my principal (and principle) disagreements with those cases. First, I do not regard it to be an abuse under U.S. tax law for an American taxpayer to voluntarily cause U.S. source income to become foreign source income when that is done for real non-tax business reasons, as I have explained. The Salem Financial court apparently thought that "the Trust transaction reflected no meaningful economic activity" by the bank in that case. 786 F.3d at 951. I think that statement is inconsistent with the court's earlier statement, quoted in footnote 4 supra, that the bank made the Barclays payment "in consideration of [the bank's] services rendered under the STARS transaction." Id. at 945. Being compensated for services rendered seems like "meaningful economic activity" to me.

I also disagree with the breadth of the Salem Financial court's statement that "the Trust transaction was a contrived transaction performing no economic or business function other than to generate tax benefits." Id. at 951. That characterization is perhaps true as applied to Barclays, but not to Sovereign, for the reasons I have explained.

And finally, for the same reasons, I disagree with the Salem Financial court that "the STARS Trust had no non-tax business purpose, and that, instead, its sole function was 'to self-inflict U.S.-sourced [bank] income in order to reap U.S. and U.K. tax benefits.'" Id. (quoting Court

of Federal Claims' finding in <u>Salem Fin., Inc. v. United States</u>, 112 Fed. Cl. 543, 587 (2013)). The trust transaction brought Sovereign the Barclays payment, a substantial economic benefit.

Similarly, I think the court in <u>Bank of New York Mellon</u> did not properly distinguish the separate interests of the participating bank and Barclays and the differing significance of the STARS transaction for each. It apparently agreed with the Tax Court's finding "that the transaction's circular cash flow strongly indicated that its main purpose was to generate tax benefits for [the bank] and Barclays." 801 F.3d at 122. The "circular flows" did not generate any tax benefit for the bank, though they did for Barclays. The bank, in this case Sovereign, did not get *any* U.K. tax benefits; it *paid* U.K. taxes that were not rebated by the U.K. And its U.S. tax benefit was limited to the ability to offset otherwise due U.S. taxes by a foreign tax credit under Section 901, a benefit that is a product of the Internal Revenue Code, not the STARS transaction.

Second, I do not think it is necessary or appropriate to apply American judicial anti-abuse doctrines to analyze Barclays' structuring of its U.K. tax liabilities so as to obtain benefits that are so far as appears entirely proper under U.K. law when that structuring itself had no effect on Sovereign's overall tax liabilities.

The <u>Salem Financial</u>, <u>Bank of New York Mellon</u>, and <u>Wells Fargo</u> cases illustrate, I think, that the judicial anti-abuse doctrines—whether substance over form or economic substance—can themselves be susceptible to abuse. Both circuit courts outlined what the latter opinion called "the core principles of the economic substance doctrine":

> The critical question is not whether the transaction would produce a net gain after all tax effects are taken into consideration; instead the pertinent questions are [1] whether the transaction has real economic effects apart from its tax effects, [2] whether the transaction was motivated only by tax considerations, and [3] whether the transaction is the sort that Congress intended to be the beneficiary of the foreign tax credit provision.

Bank of N.Y. Mellon, 801 F.3d at 117 (quoting Salem Fin., 786 F.3d at 948). In the discussion above, I have addressed the first two principles. Those principles can be evaluated by objective analysis of the facts of the case. The third principle can turn in large part on whether a court subjectively thinks the transaction being examined is "the sort that Congress intended to be the beneficiary of the foreign tax credit provision." See id.

There is no need to speculate here. We know what Congress intended in authorizing the foreign tax credit. As the government has acknowledged in its briefing, Congress intended to provide relief against possible double taxation and thus "to neutralize the effect of U.S. taxes on decisions regarding where to invest or conduct business." (United States' Reply in Supp. of Cross Mot. for Partial Summ. J. at 5 (dkt. no. 258).)[9] The government asserts that "it is an abuse of the foreign tax credit if the taxpayer uses it solely to choose where to pay tax." (Id.) Maybe. But that *reductio ad absurdum* does not accurately describe the STARS transaction. Sovereign did more than solely decide where to pay tax. It chose to enter an arm's length transaction with a foreign counterparty that had, as described above, genuine economic substance that produced real value to Sovereign. As a consequence of entering the transaction with a foreign counterparty, Sovereign incurred and paid foreign income taxes for the years in question. Application of the foreign tax credit to its U.S. tax liability would avoid what it is quite clear Congress intended should be avoided: double taxation of the same income. It is the government's position that is not aligned with congressional intent. What the government is actually defending in these STARS cases is double taxation.

---

[9] (See also Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. at 11 & n.25 (dkt. no. 246).)

Throughout the government's arguments in this case there has been an undertone of indignation, suggesting that the issues in the case are as much a matter of moral judgment as legal. The "flexible" anti-abuse doctrines, <u>Bank of N.Y. Mellon</u>, 801 F.3d at 115, are invoked to make complicated what can rationally be seen as rather simple: if you have actually paid a foreign income tax properly levied by another country, you are entitled to a credit against your U.S. taxes on the same income consistent with the applicable statutes and rules. What seems to bother the government is not so much that Sovereign does not *qualify* for foreign tax credits as that it does not *deserve* them. It is almost as if the government thinks that, under a sort of aiding and abetting theory, Sovereign should be punished by taking away its credit for helping Barclays manipulate *its* benefits under the U.K. tax laws.

The judicial anti-abuse doctrines are important, but their employment should be analytical and not visceral. Among other things, too-ready resort to the government's "trump card," <u>see</u> <u>In re CMI Holdings, Inc.</u>, 301 F.3d 96, 102 (3d Cir. 2002) (describing the economic substance doctrine as the government's "trump card"), may lead to the ad hoc development of novel principles of judgment solely on the basis of their utility for the particular case at hand. One serious risk is that the ultimate standard of decision becomes a kind of smell test, with the judge's nose ending up the crucial determinant of the outcome. The more that is the case, the less predictability there is in the law, and predictability is a high value in tax law.

## IV.    Summary of Conclusions and Order

As set forth in section I above, the loan transaction was legitimate, and Sovereign was entitled to deduct the interest expense for the loan.

As set forth in sections II and III above, the government's economic substance and substance over form arguments are unpersuasive. What may appear horribly complicated is really

15

quite simple. Sovereign incurred and paid income taxes to the U.K. for the years in question as a result of a business transaction with a U.K. counterparty, and under Section 901 and related provisions it is entitled to a credit against its U.S. income taxes for those years.

Because the foreign tax credits and the interest deductions were properly claimed, Sovereign should not be assessed penalties and may recover those.

Accordingly, Sovereign's Motion for Summary Judgment (dkt. no. 245) is GRANTED. The government's Cross Motion for Partial Summary Judgment (dkt. no. 249) is DENIED.

Sovereign shall submit a proposed form of judgment within twenty-one (21) days of the entry of this order.

It is SO ORDERED.


/s/ George A. O'Toole, Jr.
United States District Judge